# CIRCUIT COURT OF BALTIMORE CITY.

Filed February .17, 1898.

JAMES GIBBONS, THE ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE,

VS.

FRANK MORAWSKI.

*Joseph S. & Chas. W. Heuisler* and *Fredk. C. Cook* for plaintiff.

*William Pinkney Whyte, Ruddell & Hall* and *Jos. W. Bristor* for defendants.

**WICKES, J.—**

This bill is filed by the plaintiff, in whose name the title stands to the Holy Rosary Roman Catholic Church, of this city, against the defendants, to restrain them from interfering with the pastor in charge, who is the steward and agent of the plaintiff, in the discharge of his duties as such, and to compel an accounting by them of all moneys and other property which have come into their possession, and are still unlawfully kept by them, and the delivery of the same to the plaintiff or his agent, lawfully entitled to receive them.

Notwithstanding the voluminous testimony submitted at the argument, the only question presented for the decision of the Court, arises upon a construction of the Act of 1832, Chap. 308, under which the title of this property was taken in the name of the plaintiff. The Act in question provides: "That it shall and may be lawful to and for any person or persons, or body corporate, to convey unto the Roman Catholic Archbishop of Baltimore, for the time being, and his successors as aforesaid, forever, by deed * * * any lot, piece or parcel of ground * * * for the purpose of having a church erected thereon for worship according to the discipline and government of the Roman Catholic Church * * * which said lots of ground and premises when so conveyed are to be held by the said Roman Catholic Archbishop of Baltimore and his successors * * * for the uses of the members of the Roman Catholic Church worshipping at the respective places where such churches may be, according to the government and discipline of the Roman Catholic Church. * * * Provided, that nothing herein contained shall be so construed as to authorize the said Archbishop of Baltimore, or his successors, to exact from the members of any congregation, who may make conveyances under this Act, any contribution as a consideration for the use of said church property so conveyed, without their consent."

By the Canon Laws of the Church, which of course regulate its government and discipline, not only must the title to church property be taken in the name of the Archbishop, but its temporalities are to be administered by him or his duly appointed agent, who in this instance was an ordained priest, installed in the office of pastor of Holy Rosary Church.

The whole difficulty between the pastor and the defendants seems to have arisen from this fact. They were active in procuring the contributions and loans to buy this church property, and have acted throughout upon the assumption that they being members of a committee, selected as they assert, by the congregation, to manage the church property have not been permitted to do so.

This is set up in various forms in the answer filed, and representing as they did, themselves and others who had *loaned* money as well as contributed certain funds towards the purchase of the church, it was evidently intended to raise in this controversy, the question as to their rights as creditors, even if in other respects, they had no standing in Court to dispute the authority of the plaintiff.

But, after the bill and answer were filed, those who loaned money to buy the church and other property in controversy, were paid off, and their release has been filed as part of this case.

The church property now stands as purchased by those who voluntarily contributed money for the purpose—the title to which was taken under the laws of the State in the name of the plaintiff and his successors, and its temporalities administered under the Canon laws in force then and now, by the plaintiff or his duly appointed steward.

Thus, some of the defenses indicated in the answer have not been pressed, and the only question presented at the argument, is the application of the proviso to the Act of 1832, under the facts before the Court. There is absolutely nothing in the testimony to show that any contributions were ever exacted from the members of this congregation, as a consideration for the use of the church property, without their consent. If it is intended by "contributions" to mean that, pew rents, collections, cemetery charges, &c., are covered by the term, it would be difficult even then to show that any exaction of them had ever been made, without the consent of those who paid them. Indeed there

732

was no pretense that such was the case so long as the predecessors of the present pastor were in charge, although the contributions and charges do not seem to differ now from those established when the priest now in office was installed.

The difficulty has been, not that certain contributions are made, but who is authorized to receive and disburse them. The defendants contending that it is the province of this committee to do so, while by the rules governing the church it is the exclusive right of the plaintiff and his duly appointed agent.

But it is inconceivable that the "contributions" referred to in the proviso are intended to mean the usual and ordinary means and methods resorted to in all churches to raise money to defray their expenses.

The Act of 1832 permits the conveyance of church property to the Archbishop, who holds it by the very terms of the Act "for the uses of the members of the Roman Catholic Church worshipping at the respective places where such churches may be," &c.

So, when the proviso prohibits the Archbishop from exacting contributions from the members of the congregation making the conveyance, it surely does not mean that the usual and ordinary agencies by which places of public worship are maintained shall be dispensed with, although it may mean, and probably was intended to mean, that the holder of the title should not charge rent for the building, which would, of course, be wholly inconsistent with the purposes for which alone the Act of Assembly permits the title to be vested in him.

But even assuming that the word "contributions" is employed in the very broad sense attributed to it, there is not the slightest evidence that any money has ever been *exacted* from the defendants, or the comparatively few who have sided with them in this unseemly controversy, either by direct or indirect means. Some of them have been excluded from the church—some have ostracised themselves—but in all these cases it has been the result of the violence and outrage to which they themselves have resorted to get rid of a pastor who does not meet with their approval.

Their persistent misconduct has been a grave reproach to themselves and to the dignity of the church of which they are members, for not until the writ of injunction issued from this Court could public peace and order be preserved in the neighborhood of the church, or worship conducted within its walls without tumult and desecration. It is fortunate for the cause of both order and religion that our course is clear to make the injunction perpetual. A decree will be signed in accordance with these views, granting the relief prayed in the bill of complaint.